UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


STEFANIE A. COURTNEY,

      Plaintiff,                              Civil Action No. 08-10095

v.                                     HON. DENISE PAGE HOOD
                                         U.S. District Judge
                                         HON. R.  STEVEN WHALEN
COMMISSIONER OF SOCIAL            U.S. Magistrate Judge
SECURITY,

      Defendant.
_____/


## REPORT AND RECOMMENDATION

Plaintiff brings this action under 42 U.S.C. §405(g) challenging a final  decision of
Defendant Commissioner denying her application for  Supplemental Security Income under
Title XVI of the Social Security Act.   Both parties have filed summary judgment motions
which have been referred for a Report and Recommendation pursuant to 28 U.S.C. §
636(b)(1)(B). I recommend that Defendant's Motion for Summary Judgment be GRANTED,
and that Plaintiff's Motion for Summary Judgment be DENIED.

## PROCEDURAL HISTORY

On September 9, 1999, Plaintiff applied for Supplemental Security Income ("SSI"),
alleging an onset date of June 26, 1997 (Tr. 60-62).  After the initial denial of her claim,
Plaintiff requested an administrative hearing, held October 15, 2001 in Flint, Michigan (Tr.
1083).   Administrative Law Judge Arthur A. Liberty presided (Tr. 322).   Plaintiff,

represented by Timothy O'Rouke, testified, as did Vocational Expert ("VE") Mary Williams (1086-1100, 1100-1106). On December 18, 2001, ALJ Liberty found that although Plaintiff was unable to return to her past relevant work, she could perform a limited range of light work (Tr. 233).

On April 9, 2004, the Appeals Council remanded the case for further proceedings, directing the ALJ to evaluate Plaintiff's mental impairments as described in 20 C.F.R. 416.920a and obtain any existing updated mental health records (Tr. 329). The order stated further that if "updated treatment records were unavailable," a mental health consultive examination would be performed (Tr. 229). Further, "[i]f warranted by the expanded record," supplemental evidence by a vocational expert would be obtained (Tr. 330). ALJ Ransom held a rehearing on April 22, 2005 in Flint, Michigan (Tr. 262-275). Plaintiff, again represented by attorney Timothy O'Rourke, testified, as did VE Michele Robb (Tr. 1110-1133, 1133-1135). On September 9, 2005, ALJ Ransom found that Plaintiff was not disabled because although unable to perform her past relevant work, she could perform a significant range of sedentary work (Tr. 21). On November 29, 2007, the Appeals Council denied review (Tr. 6-8). Plaintiff filed for judicial review of the final decision on January 7, 2008.

## BACKGROUND FACTS

Plaintiff, born October 27, 1966, was age 38 when the ALJ Ransom issued his decision. (Tr. 60). She graduated from high school and completed one year of college (Tr. 80). She worked previously as a deli worker, bartender, computer operator, cashier, secretary, and stock clerk (Tr. 346). Plaintiff's application for benefits alleges disability as

a result of complications stemming from a right wrist fracture (Tr. 19).

### A.    Plaintiff's Testimony

#### 1.  October 15, 2001

Plaintiff, right-handed, testified that she stood 5' 5" and weighed 135 pounds (Tr. 1086).  She reported that she currently lived with her children and boyfriend (Tr. 1086). She stated that she completed one year of college in 1994, opining that her "ability to read, write and do arithmetic" was "appropriate" to her education (Tr. 1087).  She reported former work as a deli clerk, bartender, computer operator, cashier, and secretary, adding that she last worked on August 21, 1998 (Tr. 1088).

Plaintiff testified that she currently took an Albuterol inhalant, Serevent inhalant, Norflex muscle relaxers, Vicodin, a Lidoderm patch, and Zoloft (Tr. 1091).   She reported the medication side effects of confusion and grogginess (Tr. 1092).  Plaintiff alleged that the physical limitations of wrist and arm pain prevented her from working (Tr. 1092).  On a scale of one to ten, Plaintiff characterized her typical pain level as a "six," but that on occasion, she experienced up to level ten pain (Tr. 1093).

Plaintiff alleged that psychological problems also created work-related limitations, stating that her unemployment made her feel "inadequate," to the extent that she felt unmotivated to perform even household chores (Tr. 1094).   Plaintiff denied vacuuming, mopping, yard work or performing laundry chores, but testified that she continued to dust (Tr. 1095).  She estimated that she could walk up to four blocks and drove multiple times each week (Tr. 1095).  Plaintiff denied illicit drug use, but reported smoking a pack and a

half of cigarettes each day (Tr. 1096). She testified that she was unable to lift more than five pounds with her left hand (Tr. 1097).

Plaintiff reported that she slept for six hours each night, napped for two hours each day, and spent the rest of her time "[lying] on the couch . . . watch[ing] TV all day" (Tr. 1097). She denied current hobbies, but stated that she visited with her family and friends approximately once a week (Tr. 1098). She alleged that her psychological problems resulted in frequent crying jags, and on other occasions caused her to "blow up" at her boyfriend and family (Tr. 1099). Plaintiff reported that she also experienced concentrational problems (Tr. 1100)

### 2. April 22, 2005

Plaintiff, 38 at the time of the rehearing, testified that in the past two years she had taken college courses in pursuit of a degree in medical billing (Tr. 1111, 1122-1124). She alleged that she was continually distracted by hand pain which radiated from her fingertips to the back of her head (Tr. 1112). She also reported panic attacks (Tr. 1113). She opined that both her arm condition and anxiety had worsened since the first hearing, stating that she believed that the panic attacks were precipitated by frustration regarding her physical problems (Tr. 1113-1114). Plaintiff also reported sleep disturbances (Tr. 1114).

Plaintiff testified that arm pain incapacitated her approximately three times a week (Tr. 1116). She reported that overuse of her hand resulting in swelling (Tr. 1117). Plaintiff denied performing yard work or household chores beyond washing dishes (Tr. 1118). She alleged that arm problems were responsible for the failure of recent work attempts (Tr. 1118-

1119).

Plaintiff testified that she attended college classes approximately six hours a week, alleging that hand swelling, anxiety, and concentrational problems prevented her from attending school full-time (Tr. 1123-1125). She reported that her hand pain was exacerbated by cold weather, adding that she obtained partial relief from paraffin baths and icing her hand before going to bed (Tr. 1127-28). She testified to limiting Diclofenac to bedtime use but used an anti-inflammatory and Cymbalta for daytime use (Tr. 1130). Plaintiff reported that Cymbalta improved symptoms of anxiety (Tr. 1130). Nonetheless, she opined that she was unable to perform full-time work as a result of right hand problems (Tr. 1131).

### B.     Medical Evidence

#### 1. Treating Sources[1]

In September 1996, Plaintiff reported anxiety and depression, receiving a diagnosis of "acute adjustment disorder" (Tr. 219). A July 1997 report indicates that Plaintiff injured her right wrist in a June 27, 1997 workplace accident (Tr. 146). Plaintiff reported relief from heat therapy, stating that ice made it worse (Tr. 201). Imaging studies were negative (Tr. 182, 184). M. Alinea, M.D., advised Plaintiff to avoid repetitive wrist movement (Tr. 184). In August 1997, Dr. Alinea noted that an EMG failed to show evidence of carpal tunnel syndrome or nerve pathology (Tr. 178, 290). In October 1997, Plaintiff sought emergency room treatment for continued wrist pain (Tr. 164). E. Allport M.D., diagnosed a "[p]robably

---

[1]Treating records for conditions clearly unrelated to the disability claim have been reviewed but will be omitted from discussion.

scapholunate interosseous ligament tear"(Tr. 165). An arthroscopic exam revealed an "isolated" ligament injury (Tr. 163). Later the same month, Plaintiff underwent a triscaphe fusion of the right wrist (Tr. 159).

In Marc, 1998, Plaintiff reported to her occupational therapist that she regularly experienced level eight to ten pain (Tr. 531). In April 1998, Dr. Allport noted that Plaintiff experienced "the precipitous onset of pain in the operative hand" during physical therapy (Tr. 153 *see also* 510). Imaging studies showed negative results (Tr. 239). The following month, Plaintiff told her physical therapist that she had returned to work but that she "hate[d] it" (Tr. 505). In June 1998, Plaintiff underwent surgery for the removal of a ganglion cyst (Tr. 150, 196). In July 1998, Dr. Allport noted that Plaintiff's report of "a patch of numbness on the dorsum of the thumb" was "not incapacitating in any way" (Tr. 229). In August 1998, occupational therapy discharge notes state that Plaintiff experienced increased grip strength (Tr. 517). The same month, Plaintiff sought emergency treatment for pain and swelling of the right hand and wrist, requesting a work release for the following day (Tr. 147). In November 1998, Plaintiff reported headaches, dizziness, and stomach pains after exposure to dust at work (Tr. 167).

In November 1999, Dr. Allport noted Plaintiff's report that her right hand had become "swollen and painful" (Tr. 226 *see also* 276). Dr. Allport diagnosed Plaintiff with reflex sympathetic dystrophy, opining that Plaintiff should undergo nerve blocks (Tr. 226). The following month, nerve conduction studies showed results within normal limits (Tr. 269). January 2000 imaging studies were "suspicious for underlying subacute fracture" of the

navicular bone (Tr. 240). The following month, Carol L. van der Harst, M.D., prescribed Ultram and trial use of Ambien (Tr. 254). In March 2000, Plaintiff underwent "revision" surgery of the October 1997 STT fusion (Tr. 243, 908). Surgical notes indicate "nonunion of the fusion site" (Tr. 243).

In June 2000, Dr. Harst, noting continued non-union of the fusion, recommended that Plaintiff seek "occupational therapy to adapt functional daily activities" and "light non-resistive exercises" over more aggressive therapy (Tr. 249). In August 2000, Branislav Behan, M.D., estimated that Plaintiff had lost 50 percent of both grip strength and range of motion in the right hand and wrist (Tr. 285). The same month, Dr. Harst increased Plaintiff's dosage of Zoloft (Tr. 301). Imaging studies of Plaintiff's cervical spine showed a congenital fusion between C5 and C6 but otherwise normal results (Tr. 381, 883). Treating notes state that Plaintiff was advised to seek emergency treatment after calling in a report of hitting her head on a bunk bed (Tr. 362, 879). The following month, Dr. Harst noted that her navicular fusion was "doing well" (Tr. 299). In October 2000, Plaintiff reported that she was "plateauing" in therapy, but showed no wrist or hand swelling (Tr. 298). Dr. Behan, noting that Plaintiff was using a Lidocaine patch, observed that she exhibited continuing tenderness (Tr. 305). The same month, Plaintiff called in a report of domestic abuse, stating that she had been dragged by the back of her hair, resulting in head pain and "seeing bright lights" (Tr. 350). Imaging studies were negative for fracture (Tr. 827).

In February 2001, Dr. Harst recommended that Plaintiff "[c]ontinue light work duties when sleep and pain are adequately controlled" (Tr. 296). The same month, Dr. Behan

opined that Plaintiff had developed tendinitis (Tr. 303). In March 2002, Dr. Behan treated Plaintiff for a broken thumb, noting that she reported "amazing" results as a result of her previous wrist surgery (Tr. 554 *see also* 1065). In November 2002, Plaintiff reported chest pain and lightheadedness (Tr. 764, 783, 815). Treating notes show that Plaintiff was currently taking Ambien and Xanax (Tr. 780). EKG, cardiac enzyme, and stress tests yielded normal results (Tr. 773-774, 1060).

A January 2003 CT scan of Plaintiff's head showed normal results (Tr. 752). February 2003 imaging studies of the cervical spine also showed normal results (Tr. 742, 1041). In October 2003, Plaintiff sought treatment after spraining her wrist (Tr. 1026). Imaging studies showed "no acute abnormality" (Tr. 1026). In November 2003, imaging studies performed as a result of complaints of abdominal pain showed normal results (Tr. 667, 669 *see also* 1066). Plaintiff was diagnosed with "probable cholecystitis" (Tr. 656). The following month, a cystoscopy showed "entirely normal" results (Tr. 624). Likewise, an esophagogastroduodenoscopy showed "no significant upper GI lesion" (Tr. 621). A small bowel Barium exam showed a "[q]uestionably abnormal configuration of the terminal ileum" (Tr. 987). In March 2004, a CT scan of the head showed normal results (Tr. 578). In July 2004, imaging studies of the cervical spine showed normal findings (Tr. 570). In July 2004, Plaintiff sought emergency treatment for neck pain after going trout fishing (Tr. 957).

In November 2004, Plaintiff reported right shoulder pain after being trampled at a concert (Tr. 1079). Imaging results showed no fracture or dislocation (Tr. 1079). A February 2005 emergency services report indicates that Plaintiff sought emergency treatment

after experiencing shortness of breath (Tr. 1069).  She was given an aspirin and discharged in stable condition (Tr. 1069).

## 2. Consultive and Non-Examining Sources

In November 1999, a Physical Residual Functional Capacity Assessment found that Plaintiff could lift 50 pounds occasionally and 25 frequently; sit, stand, or walk six hours in an eight-hour workday; and perform unlimited pushing and pulling (Tr. 138).  The Assessment found the absence of postural, manipulative, visual, communicative, or environmental limitations[2] (Tr. 140).

In September 2000, Ann L. Date, Psy.D., performed a consultive psychological examination on behalf of the SSA (Tr. 286-292).  Plaintiff reported that she currently took Wellbutrin, also indicating that she experienced only modest improvement in right hand functioning despite undergoing six surgeries (Tr. 286).  Plaintiff, divorced twice, indicated that her second husband was physically abusive (Tr. 287).  She admitted to past alcohol abuse, stating that she had currently been sober for several years (Tr. 287).  Plaintiff exhibited spontaneous, logical, and relevant mental activity (Tr. 269).  Dr. Date gave Plaintiff a fair prognosis, assigning her a GAF of 51[3] (Tr. 201).  A Psychiatric Review Technique,

---

[2]This Assessment, which does not address limitations indicated in Plaintiff's treating records was apparently superceded by a second Physical Assessment performed in October 2000 (Tr. 117).

[3]A GAF score of 51-60 indicates moderate symptoms (occasional panic attacks) or moderate difficulty in social, occupational, or school functioning. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders--Text Revision* at 34 (*DSM-IV-TR* ) (4th ed.2000).

also performed in September 2000 on behalf of the SSA, found that Plaintiff experienced an anxiety disorder (Tr. 128, 132). The "B Criteria of Listings" found *moderate* daily living, social functioning, and concentrational deficiencies but no episodes of decompensation (Tr. 135). A Mental Residual Functional Capacity Assessment performed the same day found that Plaintiff's ability to understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; and set realistic goals was *moderately* limited (Tr. 124-125). The Assessment otherwise found an absence of significant mental limitation (Tr. 124-125).

The same month, Anjanette M. Stoltz performed a consultive physical examination of Plaintiff. Dr. Stoltz observed a limited range of right wrist motion and decreased grip strength but found that Plaintiff's finger dexterity was intact (Tr. 295). An October 2000 Physical Residual Functional Capacity Assessment found that Plaintiff could lift 20 pounds occasionally and 10 frequently; sit, stand, or walk for six hours in an eight-hour workday; and perform unlimited lower extremity and limited upper extremity pushing and pulling (Tr. 117). The Assessment found further that Plaintiff was limited to *frequent* (as opposed to *constant*) balancing, stooping, kneeling, crouching, and crawling (Tr. 118). Plaintiff was further limited to *occasional* climbing (Tr. 118). Manipulative impairments consisted of limited handling and fingering of the right hand (Tr. 119). The Assessment found the absence of visual or communicative limitations, but determined that Plaintiff should avoid concentrated exposure to vibration (Tr. 119-120).

In September 2004, Joseph Craig Jr., M.D., noted that Plaintiff had been diagnosed

with reflex sympathetic dystrophy following her wrist surgery (Tr. 406). Plaintiff reported continual right wrist pain, numbness, and tingling (Tr. 407). Dr. Craig observed that Plaintiff was able to perform unlimited fine and gross dexterity skills with her left hand (Tr. 407). He found further that Plaintiff could lift less than ten pounds and could perform only limited upper extremity pushing and pulling, determining that she retained an unlimited ability to sit, stand, or walk, but was limited to *frequent* balancing, kneeling, crouching, crawling, and stooping with a preclusion on all climbing (Tr. 409-410). Plaintiff was limited to *frequent* handling, fingering, and feeling of the right hand (Tr. 411). Dr. Craig found the absence of visual or communicative limitations, but found that Plaintiff should be exposed to only limited temperature extremes, vibration, humidity, and hazards (Tr. 411-412).

Also in September 2004, Margaret K. Cappone, Ph.D., performed a consultive psychological exam of Plaintiff on behalf of the SSA (Tr. 418). Plaintiff reported extreme wrist pain, migraine headaches, and "bouts of anger," but denied psychiatric hospitalization or current mental health treatment (Tr. 419). Plaintiff reported moderate alcohol consumption (Tr. 419). She admitted to working "under the table" as a bartender and attending college classes (Tr. 419). Plaintiff also reported meeting friends at a bar in the evenings (Tr. 421). Dr. Cappone administered the Minnesota Multiphasic Personality Inventory, Second Edition ("MMPI-II"), observing that Plaintiff "was making a deliberate attempt to present herself in an unfavorable light from a psychological standpoint" (Tr. 424). Dr. Cappone concluded that "[a]s a result, [Plaintiff's] clinical scales are artificially elevated and not valid for interpretation" (Tr. 424). She assigned Plaintiff a GAF of 52 (Tr. 426).

### C. Vocational Expert

### 1. October 15, 2001

VE Mary Williams classified Plaintiff's former work as a deli clerk as unskilled at the medium level of exertion; bartender, computer operator, and cashier as unskilled and exertionally light; and secretary, semiskilled and light[4] (Tr. 1101-1103). VE Williams found that Plaintiff's secretarial work provided the transferrable skills of typing, customer service phone skills, and filing (Tr. 1103). The ALJ posed the following hypothetical question:

> "I'd like you to assume a person of the same age with the same education and vocational history as Ms. Courtney. Further assume that this person can perform work with the following limitations. She can lift and carry ten pounds frequently, 20 pounds occasionally; walk and stand for six of eight hours; sit for two with the following additional limitation. She can not use her right upper extremity except to support items lifted or carried by the left upper extremity; no use of right hand controls; can perform simple, one or two step work processes, not at a production rate pace; and is precluded from any positions that would require her to climb ladders, ropes, or scaffolds?"

(Tr. 1103-1104).

The VE replied that the hypothetical individual would be unable to find work using Plaintiff's transferrable skills, but could nonetheless perform the following jobs at the light or sedentary exertional levels of exertion: Information clerk (1,700 jobs in the regional

---

[4]20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools; *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy* work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds.

economy), surveillance systems monitor (1,500), identification clerk (800), and school crossing guard (2,300) (Tr. 1104). VE Williams found that if Plaintiff's testimony that she needed to nap two hours everyday were fully credited, she would be unable to perform any full-time work (Tr. 1105). The VE concluded her testimony by stating that her findings were consistent with the information found in the Dictionary of Occupational Titles ("DOT") (Tr. 1105-1106).

### 2. April 22, 2005

VE Michele Robb testified that if Plaintiff's allegations of limitation were fully credited, she would be unable to perform any full-time work (Tr. 1134). ALJ Ransom posed the following hypothetical question:

> "Assume for me, if you would that she could perform sedentary work but she'd require a job with no air or vibrating tools; no repetitive or prolonged gripping, grasping or fine dexterity; no temperature extremes, and it would need to be simple, repetitive work that would not require constant close attention to detail, would require occasional supervision, regular pace work. Assuming those facts, in your opinion would there be jobs in existence in significant numbers in the regional economy that she could perform?"

(Tr. 1135).

The VE replied that such an individual could perform the job of an information clerk, (13,404 jobs in the regional economy) and credit clerk (1,075) (Tr. 1135). She stated that her testimony conformed to the DOT and its companion publications (Tr. 1135). In response to questioning by Plaintiff's attorney, she stated that if the hypothetical individual were emotionally distraught in a public setting two to three days a week, all full time work would

be precluded (Tr. 1135).

### D.    The ALJs' Decisions

### 1.  December 18, 2001

ALJ Liberty found that Plaintiff experienced the severe impairments of affective disorders; right wrist fracture with multiple surgeries; and reflex sympathetic dystrophy of the right upper extremity, determining however that none was severe enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4 (Tr. 321).   He concluded that although Plaintiff could not perform her past relevant work, she retained the capacity to perform a limited range of light work, including the sedentary/light jobs of informational clerk, surveillance system monitor, identification clerk, and school crossing guard (Tr. 321).

The ALJ supported his determination by stating that he found Plaintiff's subjective complaints "not credible" (Tr. 322).  He noted that Plaintiff's alleged degree of limitation stood at odds with her reported activities, which included caring for her children, driving, and attending social events (Tr. 320).  He determined that "[t]he fact that claimant chooses to take two-hour naps during the day is obviously a lifestyle choice and is not necessitated by any medical condition" (Tr. 320).

### 2.  September 9, 2005

ALJ Ransom found that although Plaintiff experienced the severe impairments of "residuals of multiple right wrist surgeries including fusion, congenital cervical fusion," depression and/or anxiety, and low back pain, none of the conditions was severe enough to

meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4 (Tr. 18, 21). He concluded that although Plaintiff could not perform her past relevant work, she retained the following residual functional capacity for a restricted range of sedentary work with the following restrictions:

> "no use of air or vibratory tools, no repetitive or prolonged work requiring fine dexterity, gripping or grasping. The claimant cannot perform work that exposes her to extremes of temperature. She is limited to simple, repetitive work. She is not capable of work at more than a regular pace or work that requires constant, close attention to detail. She requires occasional supervision"

(Tr. 20, 21). Citing the VE's job numbers, ALJ Ransom found that Plaintiff could perform the work of a information clerk and credit clerk (Tr. 21).

The ALJ found that Plaintiff's claims of limitation "not fully substantiated by objective medical or other evidence" (Tr. 21). He noted that Plaintiff had failed to secure records supporting her claim that she had received emergency treatment for a panic attack (Tr. 19). Observing that Plaintiff "has not been under the care of any mental health professional," the ALJ found that she experienced only mild daily living and social limitations and moderate concentrational deficiencies (Tr. 19).

## STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more than a scintilla but less that a preponderance. It is "such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986)(en banc). In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services,* 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services,* 884 F.2d 241, 245 (6th Cir. 1989).

## FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy. 20 C.F.R. §416.920(a). The Plaintiff has

the burden of proof as steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

**ANALYSIS**

First, Plaintiff disputes ALJ Ransom's credibility determination, arguing that despite an April 9, 2004 Appeals Council order remanding the case for consideration of her mental impairments, the September 9, 2005 administrative determination failed to reflect her true degree of psychological limitation. *Plaintiff's Brief, Docket #10* at 5-6. Plaintiff also argues that the ALJ erred by failing to consider her physical and psychological impairments in tandem. *Id.* at 7-9. She contends on a related note that her diagnosis of reflex sympathetic dystrophy required the ALJ to consider the interplay of her wrist condition and mental limitations. *Id.* at 8.

**A. Credibility**

**1. General Principles**

An ALJ's credibility determination is guided by SSR 96-7p, which further describes a two-step process for evaluating symptoms. *See Duncan v. Secretary of Health and Human Services,* 801 F.2d 847, 853 (6th Cir. 1986). "First, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment. . .that can be

shown by medically acceptable clinical and laboratory diagnostic techniques." *Id.* Second,

SSR 96-7p directs as follows:

> "[W]henever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record."

*Id.*

### 2. The Present Case

Contrary to Plaintiff's argument, substantial evidence easily supports the ALJ's credibility analysis and ultimate non-disability conclusion. First, despite medical records showing that Plaintiff sought frequent treatment for a plethora of non-severe conditions, ALJ Ransom found that Plaintiff's psychological limitations were "not entirely clear as she has not had any treatment on a consistent basis that would explore the nature and causes of her mental impairment"(Tr. 20). He observed further that although a September 2000 consultive psychological examination found the presence of a post traumatic stress disorder ("PTSD"), Dr. Cappone's September 2004 evaluation found the absence of such symptoms (Tr. 18). In fact, contrary to Plaintiff's contention that the ALJ did not consider her mental limitations as required by the Appeals Council order, I note that the newer consultive findings by Dr. Cappone are discussed at length in the administrative opinion (Tr. 19-20).

Additional record evidence supports the ALJ's credibility determination. Although

Plaintiff alleged continuous, disabling wrist pain, she reported in March 2002 that results of her final wrist surgery had been "amazing" (Tr. 554). Plaintiff's hearing testimony denying any hobbies stands at odds with July 2004 treating records showing that she had recently gone trout fishing (Tr. 957). Likewise, although Plaintiff alleged that severe functional limitations as a result of psychological and physical impairments severely curtailed her activities, treating records show that she was "trampled" while attending a November 2004 concert (Tr. 1079). Further, the ALJ's finding that "[t]he intensity, persistence and functionally limiting effects" alleged by Plaintiff were "not consistent with the objective medical evidence" is well supported by substantial evidence, particularly Dr. Cappone's observation that Plaintiff had deliberately exaggerated her psychological limitations (Tr. 18, 424).

Moreover, while the ALJ permissibly rejected Plaintiff's allegations of extreme limitation, he acknowledged that her impairments created some degree of limitation by precluding "work that requires constant, close attention to detail" and limiting her to "simple, repetitive work," at a "a regular pace" (Tr. 21). The present credibility determination, well supported by record evidence, does not provide a basis for remand. *Anderson v. Bowen* 868 F.2d 921, 927 (7th Cir. 1989)(*citing Imani v. Heckler,* 797 F.2d 508, 512 (7th Cir.1986)).

## B. Reflex Sympathetic Dystrophy

I also disagree with Plaintiff's argument that the ALJ failed to consider the combined effects of her physical and psychological impairments or that the administrative decision failed to account her diagnosis of reflex sympathetic dystrophy. Contrary to Plaintiff's

contention, the ALJ's residual functional capacity ("RFC") is well supported by the record.

An RFC describes an individual's residual abilities. *Howard v. Commissioner of Social Security,* 276 F.3d 235, at 239 (6th Cir. 2002). "RFC is to be an 'assessment of [Plaintiff's] remaining capacity for work' once her limitations have been taken into account." *Id.* (*quoting* 20 C.F.R. § 416.945). It is measured by a common sense approach viewing Plaintiff's conditions as a whole. *Paris v. Schweiker,* 674 F.2d 707, 710 (8th Cir. 1982). In determining a person's RFC, it is necessary to consider (1) objective medical evidence as well as (2) subjective evidence of pain or disability. 20 C.F.R. § 404.1545(a)(RFC must be based on all relevant evidence).

First, the ALJ permissibly rejected Plaintiff's allegation that she experience significant limitations as a result of reflex sympathetic dystrophy by finding that "her treatment record for this alleged impairment is not consistent with such a diagnosis," noting that she had "not sought any special treatment" for the condition since 2002 (Tr. 20). Second, Plaintiff's more general argument that the ALJ did not account for limitations as a result of both psychological and physical limitations stands at odds with the administrative decision itself. Despite the absence mental health treating records, ALJ Ransom, citing consultive examinations performed in 2000 and 2004, acknowledged Plaintiff's psychological impairments by finding that she had "a severe mental impairment in the form of a mood disorder of uncertain origin and definition" (Tr. 20). Consistent with his Step Two finding, the hypothetical question and RFC account for Plaintiff's psychological limitations as found by a Psychiatric Review Technique and Mental Residual Functional Capacity Assessment

by precluding "production rate pace" work, or work requiring more than "one or two step work processes" (Tr. 124, 135, 1135).

Further review of the hypothetical limitations undermines Plaintiff's argument that the administrative decision did not consider the cumulative effect or her mental and physical impairments. In addition to acknowledging Plaintiff's psychological limitations, the ALJ precluded the hypothetical individual from using "her right upper extremity except to support items lifted or carried by the left upper extremity;" the "use of right hand controls;" or the climbing of "ladders, ropes, or scaffolds" (Tr. 1135). Although Plaintiff of course disputes the ALJ's finding that she is capable of performing any work, the hypothetical limitations and RFC, well supported by substantial evidence, do not present grounds for remand.

Independent of Plaintiff's above-discussed arguments for benefits, I note that while she has submitted a staggeringly large medical record, a review of the entire 1136-page transcript shows that not one treating source opined that she was disabled from all work. Based on a review of this record as a whole, the ALJ's decision is easily within the "zone of choice" accorded to the fact-finder at the administrative hearing level, and should not be disturbed by this Court. *Mullen v. Bowen, supra.*

## CONCLUSION

For the reasons stated above, I recommend that Defendant's Motion for Summary Judgment be GRANTED, and that Plaintiff's Motion for Summary Judgment be DENIED.

Any objections to this Report and Recommendation must be filed within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR

72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.

S/R. Steven Whalen
R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

Dated:  November 26, 2008

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or parties of record by electronic means or U.S. Mail on November 26, 2008.

S/Gina Wilson
Judicial Assistant
